THE CITY OF ATLANTA *v.* MCDANIEL *et al.*

1. Whenever a person is possessed of property or funds, or owes a debt or duty to which more than one person lays claim, and the claims are of such a character as to render it doubtful or dangerous for the holder to act, he may apply to equity to compel the claimants to interplead. Code, §3234.

2. In view of the above section of the code, and under the facts dis-
closed by the record, it was error to deny the petition for injunc-
tion and interpleader.

May 13, 1895.   Brought forward from the last term.

Petition for interpleader, etc.   Before Judge LUMP-
KIN.   Fulton county.   November 12, 1895.

The City of Atlanta filed its petition against McDaniel
and Jenkins, praying that a suit brought by McDaniel
against the city be enjoined, and that McDaniel and
Jenkins be compelled to interplead as to their claims to
a certain amount in the hands of the city.   Interpleader
and injunction were denied, and the city excepted.

The petition alleged:   In February, 1892, the city
advertised for plans for building a bridge, proposing to
pay $500 for the plans accepted.   In November, 1893,
the plans of McDaniel were accepted conditionally, the
city agreeing to pay McDaniel $250 and to pay the re-
maining $250 when the plans were found to be satisfac-
tory to the bridge committee and city engineer.   The
latter declined to approve the plans, and for this reason
there was for a long time a controversy in the city coun-
cil as to whether McDaniel was entitled to the remaining
$250.   McDaniel employed Jenkins as his attorney at
law, and as such Jenkins appeared repeatedly before
the council, the aldermanic board and committees of
council.   Finally, in June, 1894, the city decided to pay
the $250, but did not then pay it to Jenkins as McDaniel's
attorney, upon Jenkins' demand, because on June 18,
1894, the city comptroller was notified by McDaniel that
Jenkins no longer represented McDaniel.   Afterward
the city paid McDaniel $170, but refuses to pay the bal-
ance of $80 because of a notice from Jenkins that the
claim should be paid to him as McDaniel's attorney, and
if not so paid, he would hold the city liable to him for
$83.33, the amount of his fees for services rendered in
collecting the claim, that he claimed a lien for his fees,

and that McDaniel was insolvent. So the city felt it was its duty to withhold the $80 until the question should be adjudicated, so as to protect it from having to pay out the money twice. The $80 is due either to Jenkins or McDaniel or to them jointly, and the city is ready and willing to pay it, but cannot determine without hazard to itself to whom it ought to pay, till there is a proper adjudication of the matter by a court of competent jurisdiction. Jenkins still demands payment to him and threatens the city with suit, and McDaniel has brought suit for the $80 against the city in a magistrate's court, where the city has answered setting up the facts as above, and the case has been set for a hearing. Jenkins has not been made a party to the suit, and it is doubtful whether he can be, so as to prevent a judgment in favor of McDaniel, and whether that court can render a judgment which will protect the city from having to pay the amount twice; and the city alleges that that court has no jurisdiction to properly adjudicate the matter, so as to protect the city and all parties at interest. The city is not colluding with either of said claimants to the fund, and only desires to pay it to the one entitled.

The nature of the answers of McDaniel and Jenkins will be sufficiently indicated by the following report of the evidence: The mayor testified, that the city was not conniving or confederating with Jenkins, or trying in any way to force McDaniel to settle with Jenkins; but that the petition was filed in good faith to protect the rights of the city. The city attorney testified: As such he has been familiar with the matter in all its stages. He did suggest to McDaniel to bring suit in the justice court, but this suggestion was made in the utmost good faith, and with the purpose on deponent's part to try to have the pleading in the justice court framed, by the consent of the city and McDaniel and Jenkins, so that the justice might determine to which of these two the

city was indebted, or if to both, in what proportion. This will fully appear by reference to the answer of the city in the justice court suit. He was afterwards informed by Jenkins, that Jenkins did not believe it legally possible for the justice court to exercise the jurisdiction and power contemplated by said answer, that Jenkins was so advised by eminent counsel, and that interpleader on the application of the city was the proper remedy. Feeling that this was true, unless there was active co-operation of all the parties in good faith, deponent presented the application for interpleader, which was in the main prepared, as he is informed, by Jenkins. It is wholly immaterial to the city and to deponent to which of the parties claiming the fund it should be awarded, the whole purpose of the city and of deponent being to protect the city from loss. The assistant city attorney testified, that the amendment to the bill of interpleader, waiving discovery, etc., was signed by him a few days after it was drawn; it was at least ten days or two weeks before September 15, 1894, that Jenkins handed it to him and he signed it. (No such amendment appears in the record.) It was admitted that the petition correctly stated the facts as to the litigation pending before the justice of the peace. For McDaniel, Miller testified, that Jenkins told him, shortly after he was employed by McDaniel, that his contract with McDaniel was to collect the money on a fee of ten per cent. of the amount recovered; and after the aldermanic board had defeated McDaniel's claim, Jenkins told deponent that after that action there was no chance to get the money without suit, and he would have to bring suit for it. McDaniel testified: He does not deem it necessary to give any other reply to the allegations in the answer of Jenkins as to debts of this deponent, than to say that they are to a large extent false and are maliciously dragged into the case. It is true he desired to

know and inquired what Jenkins was going to charge him. He had tried to get rid of Jenkins, and had reason to believe that Jenkins was dissatisfied because of this. He became convinced that Jenkins would not respect his contract, and was fearful that Jenkins would make an unreasonable charge in violation of his contract, and he simply wanted to know whether Jenkins was going to break his contract, but could never definitely ascertain until Jenkins notified the city that he claimed one third. McDaniel also introduced a letter from Jenkins to himself, dated June 15, 1894: "When the $250 is paid me as your attorney, I will deduct the amount of my fee therefrom, and the remainder will be subject to your order. This is all the response I have to make to your note of this date." For Jenkins, Chisholm testified, that he was friendly to both Jenkins and McDaniel, and when he heard of the controversy, undertook to bring about an adjustment of the matter; saw McDaniel, who asked him to see Jenkins about it, and stated that he had made no agreement with Jenkins as to the amount of fees, that Jenkins intended to charge him one third of the $250, and that he thought that was too much. This was between the 18th and 23d of June, 1894. A certificate from the tax-receiver showed that McDaniel returned no property for taxation for 1894. Jenkins testified: The statement by Miller that I told him I was to collect the money on a fee of ten per cent. is false. Some time after the controversy arose as to the case, and after June 16th, Miller asked me what my fees would be, and I told him one third of the claim. He seemed to think it too much, and said McDaniel thought so too. He said he thought $25 would be about right. I replied that if McDaniel had paid me $25 in cash at the outset, without reference to whether the claim was collected or not, $25 might be considered reasonable; but that as my fees were conditional, I did not

think one third an unreasonable charge. I did not tell Miller that there was no chance to get the money without suit. I do not remember telling him anything about it, though he may have heard me and McDaniel speak despondingly of the matter, and I may have told Miller that if I did not succeed in getting it through without, I would bring suit; for that was both my intention and that of McDaniel. I *bona fide* claim that McDaniel owes me $83.33 for fees in the collection of the $250. I *bona fide* claim an attorney's lien for that amount, and that it is the duty of the city to pay the $250 to me as attorney for McDaniel. McDaniel has no property in Fulton county subject to levy, and after diligent inquiry I have found him to be insolvent; and it was a wrong upon me to have paid the $170 already paid to McDaniel. Ragsdale testified: I was in the office with Jenkins between April 5, 1894, and June 20, 1894. McDaniel called a number of times in regard to his case. McDaniel asked me one time what I thought Jenkins would charge him. I told him I had no idea, and then, as a jest, said not more than $50 or $75. This was quite a long while after Jenkins was employed. I copied a great number of papers for Jenkins in regard to the case, and know that Jenkins did a great deal of hard work in the case, as McDaniel was constantly advising with him. About the latter part of June, Jenkins sent me over to get some papers and a letter from McDaniel, and McDaniel said he did not have the papers and that he had never written Jenkins any letter. Jenkins sent me over to tell McDaniel what the bill was, and it was $83.33. McDaniel never intimated to me that he had an agreement with Jenkins about fees, though he claimed that the fee charged by Jenkins was too much, and said he could have gotten other attorneys for less. I heard both of them mention the fees at different times, and from this am satisfied there was no agreement between

them as to fees. Miller, who was at McDaniel's place of business frequently, and associated with him, asked me a number of times how much I thought Jenkins would charge, and I replied I did not know but guessed it would not be over $50 or $75, and he said he thought that too much. These conversations were had during May. Letters were introduced by Jenkins, written by McDaniel to him at various dates from April 9, 1894, which tended to show, that Jenkins was employed by McDaniel as McDaniel's attorney in pressing the claim against the city, that Jenkins did work in the matter, that there was no agreement as to fees, and that McDaniel intended to resist Jenkins' claim to fees to the extent claimed by Jenkins, and denied that Jenkins was entitled to an attorney's lien for fees.

J. A. ANDERSON and FULTON COLVILLE, for plaintiff.

E. M. & G. F. MITCHELL and J. C. JENKINS, for defendants.

LUMPKIN, Justice.

As the first head-note is a literal copy of section 3234 of the code, its correctness as a legal proposition can hardly be questioned. Whether or not it is applicable in the present case depends, of course, upon the facts, which appear in the official report. No one, we think, after reading with any degree of care the reporter's statement, can have much, if any, doubt that if there ever was a case in which it was uncertain as to who was entitled to a fund in the hands of an innocent stakeholder, this is undoubtedly a case of that kind. The City of Atlanta owed at least a portion of the money it held to one of two persons laying claim to the same, and we think it clearly appears that these adverse claims were of such a character as to render it at least doubtful who was best entitled to receive the fund in controversy. It seems evident that Jenkins had a lien upon this fund

because of professional services rendered.   The precise amount to which he was entitled was, however, under the conflict presented by the evidence, purely a question for a jury.   The city could not safely, therefore, pay all the money held up to McDaniel; nor could it safely pay to Jenkins a sum greater than he was rightfully entitled to receive.   Under these circumstances, we cannot hold that it was incumbent upon the city, at its own risk, to undertake to adjust the conflicting claims between these contending parties.   In other words, we think the above cited section of the code was intended for just exactly such a case as this.

The interpleader ought to have been allowed, and the respective rights of all parties thus definitely settled by one verdict and judgment.          *Judgment reversed.*